## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

John Doe,

           Plaintiff,

vs.

College of St. Scholastica,

           Defendant.

Case No.:_____

**COMPLAINT**

---

Plaintiff John Doe, by and through his undersigned counsel, alleges, upon knowledge as to his own acts and otherwise upon information and belief, as follows:

### PARTIES

1. Plaintiff John Doe ("John Doe") has a permanent residence located in Minnesota.

2. Defendant College of St. Scholastica ("Defendant") is a private liberal arts college and a domestic non-profit corporation incorporated in Minnesota, with its principal place of business located at 1200 Kenwood Avenue, Duluth, Minnesota 55811.

3. John Doe was an active student attending the Defendant College of St. Scholastica in its elementary education program until he was suspended from Defendant St. Scholastica in May 2017 for a minimum of two years after he was accused of sexual misconduct by A.T., a fellow student.

## JURISDICTION AND VENUE

4.  John Doe invokes this Court's original jurisdiction under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* and 28 U.S.C. § 1331.

5.  John Doe also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C. § 1367.

6.  Pursuant to 28 U.S.C. § 1391, venue for this action properly lies in this judicial district because a substantial part of the events and omissions giving rise to the claims set forth below occurred in this district.

## FACTS

7.  John Doe incorporates all previous paragraphs as if fully set forth herein.

8.  John Doe was a successful high school student who was on the honor roll and was a standout athlete, and he has always wanted to be an elementary school teacher.

9.  John Doe applied to and was accepted by a number of highly competitive universities, including Defendant College of St. Scholastica.

10. After careful consideration, John Doe made the decision to forego attending the other universities that accepted him in favor of attending Defendant St. Scholastica.

11. In consideration for his decision to attend Defendant St. Scholastica and the payment of tuition, John Doe received assurances from Defendant that it would deal with him in good faith and in a non-arbitrary and non-discriminatory manner and in accordance with all applicable laws, and that he would receive all appropriate due process

protections if he were accused of violating his obligations as a student and member of Defendant St. Scholastica's community.

12. John Doe relied on these assurances when accepting St. Scholastica's offer of admission and paying his tuition.

13. John Doe has completed all of his classroom obligations, and has only a student teaching obligation to complete in order to receive his diploma from Defendant; John Doe need never step foot on Defendant's campus again except to receive his diploma.

14. On October 8, 2016, John Doe and his roommates B.C. and T.S. hosted a party at their home, which was located off Defendant's campus and owned by a private landlord.

15. John Doe invited A.T., another student attending the College of St. Scholastica, to the party.

16. At the time of the invitation, John Doe and A.T. had taken a number of classes together over the previous one to 1.5 years, had spoken with one other in class, and had been friends on Facebook for several months.

17. For a number of weeks before John Doe invited A.T. to the party at his home, the two had been communicating electronically.

18. At approximately 11:30 p.m. on October 8, 2016, A.T. informed John Doe by instant message that she was coming to his home to attend the party.

19. A.T. reports that before she left for the party at John Doe's house, she consumed a large meal.

20. By 11:30 p.m., the only remaining partygoers were John Doe, T.S. and B.C., and T.S.'s former girlfriend, M.B.

21. By 11:30 p.m., T.S. and M.B. had retired to T.S.'s bedroom.

22. When John Doe received notice from A.T. that she was coming to his home, John Doe texted his roommate T.S. that A.T. was arriving, and asked T.S. and M.B. to join him in the living area of the home so that he would not feel awkward when A.T. arrived.

23. A.T. arrived at John Doe's home at approximately midnight on the evening of October 8, 2016.

24. When A.T. arrived, T.S. and M.B. joined A.T. and John Doe in the living area of the home.

25. T.S. reports that he had been drinking alcohol earlier in the day, but was not under the influence of alcohol during the time that A.T. was present.

26. M.B. reports that she consumed enough alcohol that she did not feel that she could legally drive when A.T. arrived, but that she did not consume so much alcohol that she could not perceive and remember the events of the evening accurately during the time that A.T. was present.

27. John Doe consumed alcohol over the course of the day, but he did not consume so much alcohol that he could not perceive and remember the events of the evening accurately during the time that A.T. was present.

28. John Doe, T.S., and M.B. all report that roommate B.C. was extremely intoxicated for much of October 8, 2016, and October 9, 2016, including during the time that A.T.

was present, and that it is unlikely that B.C. could accurately perceive or remember the events of October 8, 2016, and October 9, 2016.

29. A.T. arrived at John Doe's house with a mixed drink in a covered container with a straw, which she reports contained one ounce of distilled spirits.

30. Over the course of the next 2-3 hours, A.T. consumed that beverage, as well as another beverage containing what she reports contained one ounce of distilled spirits, for a total of two ounces of distilled spirits consumed by A.T. while she was with John Doe.

31. The National Institutes of Health and the United States Department of Health and Human Services consider a "standard" alcoholic beverage for their purposes to contain 1.5 ounces of distilled spirits.

32. A.T. described both drinks as "light" in terms of their alcohol content.

33. A.T. reports that she has Type I diabetes and is very careful with the management of her diabetes and her consumption of alcohol.

34. The American Diabetes Association recommends that people with diabetes follow the same guidelines as those without diabetes if they choose to drink, including the guideline that women should consume no more than 1.5 ounces of distilled spirits per day.

35. John Doe, M.B., and T.S. estimate that A.T. is between 5'6" and 5'7" tall, and weighs approximately 165 pounds.

36. A.T. made her second beverage in the covered container with the straw, as well, by combining vodka with lemonade and citrus soda.

37. A.T. either used alcohol and a drink mix she brought with her in order to make her second beverage, or she used the same lemonade and citrus soda that others present consumed.

38. Upon A.T.'s arrival, A.T., John Doe, B.C., T.S., and M.B. sat around a table located in the roommates' living room.

39. M.B. sat to A.T.'s right at the table.

40. A.T. positioned her covered beverage on the table to her right, between A.T. and M.B., such that John Doe did not have access to it.

41. While A.T.'s beverage was positioned on her right, between A.T. and M.B., M.B. tried A.T.'s beverage and noted that it tasted as if it contained little alcohol.

42. While at John Doe's home, A.T. sent a text message to her friend Danielle Larson that John Doe was "putting the moves" on her, and that while she found it "strange," she was planning to "comply."

43. Sometime between 2:00 a.m. and 4:00 a.m. on October 9, 2016, in the presence of M.B. and T.S., John Doe and A.T. stood up from the table and indicated that they were going to bed.

44. M.B. and T.S. both observed A.T. go to John Doe's room upon her own initiative, without hesitation, and under her own power.

45. After A.T. and John Doe left the table, M.B. and T.S. remained behind and cleaned up the kitchen before ultimately leaving the home.

46. Once in John Doe's room, A.T. sent a text message to Ms. Larson that said, "Lol I'm in his bed."

47. While A.T. and John Doe were lying in John Doe's bed, he put his arm around her, then kissed her forehead, and then kissed her lips.

48. After John Doe kissed A.T.'s lips, he asked her if she consented to engage in sexual activity with him.

49. A.T. verbally agreed to engage in sexual activity with John Doe.

50. Except for instances in which John Doe sought A.T.'s consent to various specific sexual activities, and A.T. responded verbally that she consented, A.T. and John Doe said little to each other, except to conclude that they would need to use a condom in order to have sexual intercourse.

51. John Doe applied a condom that he was keeping in his room, and A.T. and John Doe engaged in sexual intercourse.

52. After engaging in sexual intercourse, John Doe and A.T. chatted and exchanged compliments.

53. During the time that John Doe and A.T. were chatting, they began to touch each other sexually again, but determined that they could not engage in intercourse a second time because they had no condom.

54. Before and during sexual activity, John Doe asked A.T. repeatedly if she consented to various sex acts because he was aware that other male students had been disciplined for failing to do so.

55. Whenever John Doe sought A.T.'s consent to sexual activity, she provided it verbally.

56. A.T. performed sexual acts on John Doe without first seeking his verbal consent, including performing oral sex on John Doe and sitting atop him while engaging in sexual intercourse.

57. After concluding that they could not engage in intercourse a second time, A.T. and John Doe fell asleep in John Doe's bed.

58. Once A.T. and John Doe fell asleep, they did not engage in any further sexual activity.

59. John Doe and A.T. awoke around 9:30 a.m. on the morning of October 9, 2016, and after discussing an upcoming assignment in a shared class, A.T. left John Doe's home.

60. On the morning of October 9, 2016, A.T. sent a number of additional messages to Ms. Larson about her evening with John Doe.

61. A.T. wrote that she was not romantically interested in John Doe, and would not have had intercourse with him sober, but maybe her "drunk self wanted it," even though it was virtually impossible for A.T. to have been intoxicated when she was with John Doe given the small amount of alcohol she consumed.

62. A.T. also wrote to Ms. Larson that she observed John Doe and his roommate T.S. exchanging looks, which she believed was evidence of some kind of plan intended to result in intercourse between A.T. and John Doe.

63. Because she was insulted by the "plan," A.T. texted Ms. Larson, she wasn't going to talk to John Doe in class, and while she was "not going to make it awkward," she also was "not reaching out."

64. Ms. Larson responded by text message to A.T., "Well I mean at least you have some experience for the next guy!  Drunk sex is the best though…."

65. A.T. agreed with Ms. Larson's assessment, responding, "Yeah, it's shitty, but nothing I can do about it. And yeah, that's true!  Also, Spencer just snapped me so there's a positive speck of sunshine."

66. Through the morning of October 9, 2016, A.T. continued to exchange text messages with Ms. Larson, and with other friends, and talked to Ms. Larson on the phone.

67. Over the course of October 9, 2016, A.T. became increasingly focused on and upset over her belief that John Doe and his roommate T.S. formulated a plan that would result in A.T. engaging in sexual intercourse with John Doe, evidenced by "looks" that they exchanged.

68. Over the course of October 9, 2016, A.T. claimed to somehow recover lost memories, and ultimately concluded after "processing" with her sister and Ms. Larson that John Doe "roofied" (an apparent reference to Rohypnol, a powerful tranquilizer) and raped her.

69. On or around October 9, 2016, John Doe sent A.T. two instant messages using Facebook to ensure that she was okay as the two had no existing romantic relationship and had never had intercourse before, they would continue to see each other in class, and he did not want future exchanges to be awkward or uncomfortable.

70. A.T. did not respond to John Doe's messages.

71. On October 10, 2016, A.T. visited a doctor for an exam during which medical tests were performed to determine whether A.T. had been given any kind of incapacitating drug.

72. Medical tests performed on A.T. showed no evidence of Rohypnol, or any other sedative, tranquilizer, or "date-rape drug," in A.T.'s body.

73. A.T. reports that on or around October 10, 2016, she made an anonymous report on Defendant's website that John Doe sexually assaulted her.

74. Defendant did not notify John Doe of the anonymous report, even though he would have been best able to rebut an accusation that he committed sexual assault at the time of the anonymous report.

75. On January 30, 2017, investigators from the Office for Civil Rights at the United States Department of Education came to Defendant's campus to investigate another student's complaint that her rights were violated under Title IX when Defendant failed to respond vigorously enough to the student's claims that she was sexually assaulted while participating in one of Defendant's study abroad programs.

76. On February 1, 2017, nearly four months after A.T. and John Doe had intercourse, A.T. filed a complaint against John Doe with Defendant in her own name and was interviewed by employees of Defendant's Gender Equity and Anti-Violence Allies (GEVA) office.

77. Despite having undergone testing that showed no evidence of a sedative, tranquilizer, or any other kind of incapacitating drug in her system on October 10, 2016, A.T. repeated her accusation that she believed John Doe drugged her.

78. In her complaint, A.T. claimed that John Doe obtained a condom from his roommate's room and then forced her to engage in intercourse for the first time, and then she fell asleep.

79. In her complaint, A.T. claimed that she awakened after having intercourse the first time, and then John Doe forced her to engage in intercourse a second time.

80. A.T.'s complaint provided few details related to her accusations generally, and no details about her accusation that John Doe forced her to engage in sexual intercourse a second time, but the author of the report indicated that she did not want to "pressure" A.T. for information during her interview.

81. In her complaint, A.T. also claimed that John Doe attempted to engage in intercourse with her a third time and that he asked her if she was using birth control, but that she told John Doe that she was not, and so he was stymied in his attempt to engage in intercourse with her for a third time.

82. As a result of A.T.'s complaint, Defendant initiated an investigation of her claims.

83. On February 14, 2017, John Doe received a phone call from David Bauman, Defendant's current Title IX Coordinator, asking him to come to the office of Defendant's Dean of Students.

84. John Doe believed that Mr. Bauman was asking him to come to the office of Defendant's Dean of Students because John Doe was going to be included on the Dean's list of students for superior academic performance.

85. Instead, John Doe was confronted by Jeri Collier, Title IX Deputy; Gerald Henkel-Johnson, Professor of Psychology; and Terri Van Reese, Human Resources Specialist.

86. Jeri Collier told John Doe that she was a Title IX coordinator, and that she was responding to a complaint of sexual assault under Title IX.

87. Ms. Collier told John Doe that Nam Provost, Director of the Office of Inclusive Excellence/Human Resources and Title IX Coordinator, was responsible for ensuring that the process was "fair."

88. Ms. Collier recommended that John Doe meet with Defendant's head baseball coach, Corey Kemp, who could serve as a "support person," describing him as "someone you can talk things through with" who was a "good listener" and "trained GEVA ally."

89. Ms. Collier introduced Gerald Henkel-Johnson and Terri Van Reese, whom she described as trained investigators who were "impartial," and that there roles were ones of "neutrality" and "non-judgment."

90. Mr. Henkel-Johnson told John Doe, "We as investigators will keep anything we know confidential," and, "This is not a court of law; we're not asking you to take an oath."

91. Before Mr. Henkel-Johnson began to interview John Doe, John Doe said, "I'm kind of blindsided. I don't really know what is going on, what is being charged against me. I'm kind of confused."

92. Nonetheless, John Doe was not provided with any information about A.T.'s complaint against him before the interview commenced.

93. Mr. Henkel-Johnson told John Doe that A.T. claimed that she was "hit really hard" after consuming a few alcohol beverages and was "really out of it," and asked John Doe if he would agree with that statement.

94. John Doe told Mr. Henkel-Johnson and Ms. Van Reese that he agreed with A.T.'s descriptions of herself as extremely intoxicated, even though A.T. did not appear intoxicated on October 8, 2017, and October 9, 2017.

95. John Doe said that A.T. appeared intoxicated because John Doe has a strong instinct to agree with others and experiences social anxiety when he does not, he is very vulnerable to suggestive questioning as a result, he did not fully understand the nature or seriousness of the accusations leveled against him, and he was in shock.

96. At the end of interview, John Doe asked what has been "charged against me, if that can be shared."

97. Mr. Henkel-Johnson told John Doe that he could not disclose the accusations made against him, but hinted that John Doe could probably figure out A.T.'s claims based on their questions, and that John Doe should consider asking Nam Proctor, because she was "an important player."

98. At the conclusion of the interview, Mr. Henkel-Johnson warned John Doe against interfering with witnesses, and was told that "confidentiality is important."

99. John Doe understood from this exchange that Defendant forbid him from talking to his roommates, M.B., or any other potential witness about Defendant's investigation.

100.   John Doe was also informed that effective immediately he could not attend a class that he shared with A.T., a prohibition that remained in effect for two weeks, until Defendant reversed its decision inexplicably.

101.   On February 22, 2017, Nam Provost told John Doe's parents that because Defendant was engaged only in an "administrative investigation," legal representation was "neither necessary nor allowed."

102.   Defendant's own Sexual Misconduct Manual forbids Defendant from limiting the choice of advisor or presence of the advisor for the complainant or respondent in any meeting or disciplinary process.

103.   John Doe and his parents trusted Defendant and relied on the information Ms. Provost provided, and so they did not seek the assistance of an attorney.

104.   On March 3, 2017, John Doe was interviewed by Gerry Henkel-Johnson a second time.

105.   John Doe's father attended the interview with John Doe, but Defendant did not allow John Doe's father to participate in the interview.

106.   During the second interview, John Doe told Defendant's investigators that A.T. did not appear intoxicated.

107.   John Doe told Defendant's investigators that A.T. did not appear intoxicated in his second interview because it was the truth, because he was not blindsided by Defendant's employees, and because he had the benefit of his father's support.

108.   Other than to comment that "it was kind of like both sides" for John Doe to say that A.T. appeared to be intoxicated during his first interview with Mr. Henkel-Johnson and that she did not appear intoxicated during his second interview, Defendant's investigators pursued that inconsistency no further.

109.    John Doe expressed concern that it was difficult to remember the details of the
events occurring on October 8, 2016, and October 9, 2016, because of the passage of
seven months.

110.    John Doe asked questions about how A.T.'s claims would affect his future
education and employment, and was told to contact Nam Provost for answers to his
questions.

111.    John Doe again expressed concern that all he understood was that there was a Title
IX issue, but he had not been told about "the allegations or complaint," that he did not
know what he had been "accused of or charged with," and that he'd received "no
paperwork."

112.    Defendant's investigators were unresponsive to John Doe's concerns.

113.    On March 24, 2017, David Bauman and Terri Van Reese interviewed John Doe a
third time.

114.    John Doe's father attended the interview with John Doe, but Defendant did not
allow John Doe's father to participate in the interview.

115.    Mr. Bauman told John Doe that he had been "doing this" since 1994, understood
the kinds of facts an adjudicator would need to know in order to make a decision, and
was interviewing John Doe again so that an adjudicator would not request additional
information.

116.    Mr. Bauman asked John Doe if he understood the nature of the allegations against
him.

117.    John Doe responded that all he knew was that he was accused of sexual assault.

118.   At the conclusion of the third interview, John Doe told Mr. Bauman that he did not understand the "actual assertions," that he understood that he was accused of sexual assault, but he did not understand whether A.T. was claiming that she was unable to give consent to sexual activity because she was incapacitated, or making other claims.

119.   Mr. Bauman told John Doe that all he could tell him was that John Doe was accused of engaging in nonconsensual intercourse, that "a lot could go underneath that," including "consent, no consent, consciousness, unconsciousness," and that John Doe would learn the specifics of A.T.'s claims when he received Defendant's finished report.

120.   John Doe again asked Defendant's investigators how A.T.'s claims would affect his future, including whether he could be expelled as a result of A.T.'s claims, whether he could be a teacher, and whether he could get a teaching license, and was told that a breadth of sanctions was available.

121.   Defendant's investigators also interviewed A.T.; B.C.; T.S.; M.B.; C.T., A.T.'s sister; Natalya Peterson, A.T.'s friend; C.H., A.T.'s roommate; Danielle Larson; L.T., A.T.'s mother; Lexie Generous, a member of Defendant's Gender Equity and Anti-Violence Allies (GEVA) program; Andrea Daube, an intern in Defendant's GEVA program; Kathryn David, A.T.'s friend; Rachel Payne, an assistant professor at the College of St. Scholastica; and Corey Kemp, the person Defendant suggested John Doe rely on for support.

122.   Under Defendant's policies, investigations of sexual misconduct claims are to be conducted by trained investigators who provide a thorough, fair, and impartial investigation.

123.   The investigators who questioned John Doe and other witnesses were Defendant's employees, including Gerald Henkel-Johnson, Professor of Psychology; Terri Van Reese, Human Resources Specialist; Lori Barnstorf, Administrative Assistant; Dory Pohl, Director of Student Support Services; and David Bauman, who is now Defendant's Title IX Coordinator.

124.   Defendant's expertise is in making inherently educational decisions, and Defendant has no significant expertise in the area of investigating and adjudicating quasi-criminal sexual misconduct allegations.

125.   It is Defendant's policy that an individual who accuses a student attending the College of St. Scholastica of sexual misconduct may decide when or when not to repeat a description of the accusation without reprisal.

126.   When Defendant's investigators interviewed A.T., she referred Defendant's investigators back to her GEVA interview for information about her claims, which was woefully short on details and conducted by interviewers who did not want to "pressure" her.

127.   As a part of Defendant's investigation, interviews with witnesses were recorded, but Defendant would not allow John Doe to gain access to those recordings.

128.   In the course of Defendant's investigation, Defendant recovered text messages sent between A.T. and Danielle Larson by obtaining them from Ms. Larson.

129.   Nothing in the investigative file suggests that Defendant's investigators attempted to obtain text messages A.T. reported that she sent to other individuals on the morning of October 9, 2016.

130.   Defendant produced a report based on its investigation.

131.   Defendant's investigative report contains only selected statements from interviews with A.T., John Doe, B.C., T.S., M.B., C.T., and Danielle Larson.

132.   Defendant refused to provide John Doe with interviewers' notes from interviews of witnesses whose statements were not contained in the report.

133.   Defendant's investigative report contains no reference to the text messages Ms. Larson provided, which contained information that undermined A.T.'s credibility.

134.   Defendant's investigative report indicated that John Doe reported that he and A.T. had engaged in consensual sexual activity on one occasion before October 9, 2016, even though recordings of Defendant's interviews of John Doe demonstrate he reported no such thing.

135.   In Defendant's investigative report, A.T. states that she consumed one ounce of rum in a drink she made and brought to John Doe's house.

136.   In Defendant's investigative report, A.T. states that she made herself a second alcoholic beverage while at John Doe's home containing another ounce of alcohol, and that after consuming a quarter of the second drink, she experienced the sudden onset of inebriation unlike she had ever experienced before.

137.   Defendant's investigative report contains no information regarding A.T.'s height or weight on October 8, 2016, and October 9, 2016.

138.   Defendant's investigative report did not include A.T.'s claim that she ate a large dinner before going to John Doe's home.

139.   Defendant's investigative report contains no information regarding the regularity with which A.T. consumed alcohol before October 8, 2016.

140.   Defendant's investigative report does not reach the obvious conclusion that it would be virtually impossible for a full-size adult woman to experience the onset of sudden inebriation after consuming 1.25 ounces of distilled spirits, less alcohol than is contained in a single standard alcoholic beverage, particularly after consuming a large meal.

141.   In Defendant's investigative report, A.T. states that she placed her drink on the table next to John Doe, where it was accessible to him.

142.   Defendant's investigators did not ask M.B., who tried A.T.'s drink, where A.T. kept her drink on the table.

143.   If Defendant's investigators had asked M.B. where A.T. placed her beverage, she would have reported that A.T. placed her beverage on the table between the two of them, such that it was not accessible to John Doe.

144.   In Defendant's investigative report, A.T. states that because of the rapid onset of inebriation, she put head down on the kitchen table and was slurring her words, causing M.B. to ask how she was feeling and if she needed some water.

145.   In Defendant's investigative report, A.T. states that M.B. appeared surprised by how rapidly and significantly inebriated A.T. became.

146.   Defendant's investigators did not ask M.B. to corroborate A.T.'s statements about M.B., and M.B. does not corroborate those statements.

147.   If Defendant's investigators had sought to corroborate A.T.'s statements with M.B., M.B. would have reported that A.T. never appeared inebriated, never put her head down on the table, and never slurred her words, and M.B. never asked A.T. how she was feeling or if she wanted a glass of water.

148.   Defendant's investigators never asked T.S. to corroborate A.T.'s statements about M.B., and T.S. does not corroborate those statements.

149.   If Defendant's investigators had sought to corroborate A.T.'s statements with T.S., T.S. would have reported that A.T. never appeared inebriated, never put her head down on the table, and never slurred her words, and he never observed M.B. asking A.T. how she was feeling or if she wanted a glass of water.

150.   In Defendant's investigative report, A.T. states that she observed John Doe and T.S. exchanging looks that she believed were part of a plan to get her to engage in sexual activity with John Doe.

151.   In Defendant's investigative report, A.T. states that M.B. noticed that John Doe and T.S. were exchanging suspicious looks and commented on them, but M.B. does not corroborate A.T.'s claims.

152.   If Defendant's investigators had sought to corroborate A.T.'s statements with M.B., she would have reported that she did not comment on any "looks" between John Doe and T.S. because she observed no such "looks."

153.   If Defendant's investigators had questioned T.S. about whether there was any "plan" intended to result in sexual activity between John Doe and A.T., T.S. would have reported that there was no such plan, that he had no idea that A.T. was coming to his home until John Doe informed him by text message shortly before A.T. arrived, and that he had no interest in their sexual activity.

154.   Defendant's investigative report notes that B.C. reported that he consumed twenty-five alcoholic beverages on October 8, 2016, and in the early morning hours of October 9, 2016, but Defendant appears to have treated B.C. as a reliable witness despite the extraordinary amount of alcohol he consumed, without explanation.

155.   Nothing in Defendant's investigative report suggests that Defendant asked T.S., M.B., or John Doe whether they observed that B.C. was too inebriated to serve as a reliable witness to the events of October 8, 2016, and October 9, 2016.

156.   If Defendant's investigators had asked T.S., M.B., and John Doe whether B.C. was too inebriated to be a reliable witness, all would have told Defendant's investigators that testimony from B.C. regarding any events taking place on October 8, 2016, and October 9, 2016, was inherently unreliable given how intoxicated he was.

157.   In Defendant's investigative report, A.T. states that M.B. and T.S. left the home before she and John Doe retired to John Doe's bedroom, but M.B. and T.S. do not corroborate A.T.'s claim.

158.   Defendant's investigators do not appear to have questioned M.B. and T.S. about when they vacated the premises.

159.   If Defendant's investigators had questioned M.B. and T.S., both would have reported that they left the home after A.T. and John Doe retired to John Doe's room, and not before, as A.T. reported.

160.   Defendant's investigative report contains statements that A.T. could not remember walking to John Doe's bedroom, and also that she required John Doe's assistance to travel to his bedroom.

161.   Nothing in Defendant's investigative file suggests that Defendant took note of this inconsistency.

162.   Defendant's investigators did not ask M.B. and T.S. about how A.T. traveled from the living area of the home to John Doe's bedroom.

163.   If Defendant's investigators had asked M.B. and T.S. about how A.T. travelled from the living area of the home to John Doe's bedroom, M.B. and T.S. would have reported that A.T. walked on her own initiative, willingly, and under her own power from a chair at the table in the living room to John Doe's bedroom after wishing M.B. and T.S. a good night, and that any report to the contrary was a complete fabrication.

164.   Defendant's investigative report contains a statement from A.T. that she texted Ms. Larson while she was at John Doe's house to tell her that she was uncomfortable engaging in sexual activity with John Doe.

165.   Text messages provided by Ms. Larson do not support A.T.'s claim that she texted Ms. Larson to express her discomfort in engaging in sexual activity with John Doe, but rather that she was ambivalent about which young man she preferred.

166.    Nothing in Defendant's investigative file suggests that Defendant took note of that inconsistency.

167.    A.T. reported to investigators that she drifted in and out of consciousness and was paralyzed due to intoxication while she was in John Doe's bedroom.

168.    Defendant's investigative report contains no observations on the extreme unlikelihood of that claim given the amount of alcohol A.T. consumed on the evening of October 8, 2016, and early morning of October 9, 2016.

169.    Defendant's investigative report contains no observations on the extreme unlikelihood of A.T.'s claims that someone put drugs in her beverage given that A.T. prepared all of the beverages she consumed, her beverage was in full view of others where it sat between A.T. and M.B., M.B. tried A.T.'s beverage to no ill effect, A.T. consumed her beverages from a covered container, neither M.B. nor T.S. observed any change in A.T.'s behavior, and medical testing showed that A.T. had no sedatives or tranquilizers in her system on October 10, 2016.

170.    Both A.T. and John Doe were allowed to respond in writing to Defendant's investigative report.

171.    John Doe was not allowed to keep a copy of the report.

172.    Instead, he had to drive a total of six hours from his home to Duluth and back, where he was allowed to take notes on the report, and those notes, rather than the report itself, formed the basis of his response to the report.

173.    Defendant limited John Doe to 2000 words in his response to its report.

174.   In A.T.'s response to the investigative report, she claims that she was sitting on a couch charging her cellular phone when John Doe approached her to move her to his bedroom, where he ultimately raped her.

175.   The couch was located in a room that contained no accessible outlets that could be used to charge a cellular phone.

176.   In her response to Defendant's investigative report, A.T. criticizes John Doe's failure to provide her with financial assistance after the two engaged in sexual intercourse.

177.   Defendant appears not to have questioned A.T. about the basis for this unusual expectation.

178.   A.T. was provided with a copy of John Doe's response to Defendant's investigative report, and A.T was allowed to comment on John Doe's response.

179.   In her comments on John Doe's response to Defendant's investigative report, A.T. claimed that she received messages from John Doe that were "coercive" to come to the party at his home, and that she told him multiple times that she was tired and in bed, and attempted to come up with a "variety of excuses" to avoid going to his home, but ultimately John Doe was "persuasive."

180.   However, Defendant's investigative file contains a prior statement from A.T. that she received an invitation from John Doe to his party, and she contemplated whether to go, but ultimately decided to go because she was "excited" to meet new people.

181.   John Doe denies that he sent multiple and coercive messages to A.T., and A.T. has produced no such messages.

182.   Nothing in Defendant's investigative file suggests that Defendant took note of A.T.'s inconsistent reporting.

183.   In A.T.'s comments on John Doe's response to Defendant's investigative report, she wrote, "It is my understanding that [John Doe] believes adequate consent is listening to a 'yes' or 'no.'  Consent runs deeper than a simple yes or no.  I consider his understanding of consent to be inadequate, childish, and extremely surface level."

184.   Nothing in Defendant's investigative file suggests that A.T. was asked why she offered the unusual perspective that obtaining verbal consent to sexual activity is inadequate, particularly in light of her previous claims that she verbally conveyed to John Doe that she did not consent to sexual activity with him.

185.   In her comments on John Doe's response to the investigative report, A.T. stated that when complaining about John Doe to Defendant, she asked for the "least sanction possible" and simply did not want to participate in a student teaching program with John Doe, but now she wants him removed from Defendant's elementary educational program because he was challenging her claims that he raped her.

186.   Defendant appears not to have questioned A.T. about why she would ask for the "least sanction possible" against an individual she has claimed ripped off her clothes and raped her, at the same time that she was expressing concerns for other students in Defendant's educational program, and even for his future elementary students

187.   Under Defendant's Sexual & Gender-Based Misconduct Policy, all proceedings involving a sexual misconduct complaint must result in an impartial resolution.

188.    Although Defendant's policies make available a "formal hearing option" for

students accused of sexual misconduct, Defendant never offered John Doe a formal

hearing, and John Doe was not aware of such an option until after Defendant

determined that it was more likely than not that he committed sexual misconduct and

John Doe appealed that decision.

189.    Under Defendant's policies, a formal hearing includes the right to present

witnesses and to confront witnesses against the accused.

190.    Defendant did not allow John Doe to present witnesses or to cross-examine A.T.

or any witnesses, either directly or indirectly.

191.    Defendant's policies that permit a formal hearing to a student accused of sexual

misconduct also permit an appeal from the formal hearing.

192.    A student may appeal the decision obtained through a formal hearing for the

following grounds.

   a.  To determine whether the original hearing was conducted fairly in light of

      the charges and evidence presented and in conformity with prescribed

      procedures giving the party a reasonable opportunity to prepare and present

      evidence that the student code of conduct was violated, and giving the

      accused student a reasonable opportunity to prepare and to present a

      rebuttal of those allegations.

   b.  To determine whether the decision reached regarding the accused student

      was based on substantial evidence; that is whether the facts in the case were

sufficient to establish that a violation of the Student Code more likely than not occurred.

c. To determine whether the sanction(s) imposed were appropriate for the violation of the Student Code which the student was found to have committed.

d. To consider new evidence (sufficient to alter a decision) or other relevant facts not brought out in the original hearing, because such evidence and/or facts were not known or reasonably discoverable by the person appealing at the time of the original hearing.

193. Had Defendant advised John Doe of his right to a formal hearing he would have exercised that right, and with exculpatory testimony from M.B. and T.S., it is unlikely that an impartial and competent decision-maker would have found it more likely than not that he committed sexual misconduct.

194. On May 10, 2017, Megan Perry-Spears, Defendant's Dean of Students, issued a decision in response to A.T.'s complaint that the preponderance of evidence showed that John Doe had committed sexual misconduct.

195. Defendant's decision stated that there is a presumption of "non-responsibility" on the part of the accused, and that the accused will not be deemed responsible for violating Defendant's Sexual & Gender-Based Misconduct policy "absent evidence establishing that it is more likely than not that he violated the Policy."

196. However, in Defendant's Sexual & Gender-Based Misconduct Policy Manual, a person who complains to Defendant that he or she has been subjected to sexual

misconduct is defined as the "victim," and is otherwise referred to in the Manual as
the "victim/survivor," before adjudication.

197.    Defendant's decision repeats A.T. claim that her capacity to give consent was

impaired on October 9, 2016, by a substance other than alcohol, without noting that

this was practically impossible given that A.T. prepared all of the beverages she

consumed, her beverage was in full view of others where it sat between A.T. and

M.B., M.B. tried A.T.'s beverage to no ill effect, A.T. consumed her beverages from a

covered container, neither M.B. nor T.S. observed any change in A.T.'s behavior, and

medical testing showed that A.T. had no sedatives or tranquilizers in her system on

October 10, 2016.

198.    In her decision, Defendant's Dean of Students found that A.T. reported that she

made herself a mixed drink containing one ounce of rum prior to arriving at John

Doe's house, and reported that she began to feel extremely intoxicated soon after she

began drinking her second alcoholic beverage.

199.    Defendant's Dean of Students found that A.T. was credible in her description of

her intoxication level based on her own reporting, her "loss of consciousness," and

"text message evidence."

200.    Defendant's Dean of Students made no effort to reconcile A.T.'s reporting, her

"loss of consciousness," and "text message evidence" with the small amount of

alcohol A.T. reports that she consumed before feeling the sudden onset of extreme

inebriation, the small amount of alcohol that A.T. consumed overall over the course of

several hours, A.T.'s size, her claim to have eaten a large meal before going to John

Doe's home, and the reporting of T.S., M.B., and John Doe.

201. Defendant's Dean of Students found A.T.'s claims that she refused to consent to

sexual activity more credible than John Doe's claims that he obtained consent to

sexual activity because A.T.'s account was more "plausible" and "consistent" than

John Doe's account.

202. The basis for Defendant's Dean of Students' determination that A.T.'s reporting

was more "plausible" was her belief that John Doe reported that he interrupted

intercourse to confirm that engaging in intercourse was something A.T. wanted to do,

telling A.T. that he didn't want to "press her."

203. If Defendant's Dean had listened to the interviews of John Doe, or if Defendant's

investigators had accurately conveyed the content of John Doe's interviews,

Defendant's Dean would have known that John Doe did not report that he interrupted

intercourse for any reason, including in order to obtain A.T.'s consent to intercourse.

204. Rather, Defendant's Dean would have heard John Doe report that he was regularly

checking in with A.T. while engaging in all manner of sexual activity to confirm that

she was comfortable and did not feel pressured, as he had been taught to do.

205. Defendant's Dean of Students found that it was "unclear why [John Doe] would

stop having intercourse if he had engaged in such discussions and had obtained

definitive consent prior to his initiation of the sexual acts."

206. The adjudicative process that Defendant offered John Doe did not allow him to

clarify for Defendant's Dean of Students that he did not stop having intercourse in

order to obtain A.T.'s consent to intercourse, and the Dean of Students made no effort to obtain clarification from John Doe.

207.   Defendant's Dean of Students found that John Doe was an inconsistent reporter because, when he was first interviewed by Defendant's investigators, he said that A.T. appeared inebriated while at his home, and subsequently reported that A.T. did not appear inebriated.

208.   The adjudicative process that Defendant offered John Doe did not allow him to clarify for Defendant's Dean of Students why he reported first that A.T. appeared inebriated at his home, and subsequently reported that she did not.

209.   However, even if the Defendant's Dean of students had asked John Doe why he did not consistently report that A.T. was not intoxicated in his home, he would have been at a real disadvantage in articulating the reason without the help of an attorney.

210.   Defendant's Dean of Students also found that John Doe was an inconsistent reporter because she believed that he reported both that he and A.T. kissed and touched without conversation before having intercourse, and that he and A.T. kissed and touched while conversing before having intercourse.

211.   If Defendant's Dean of Student's had listened to the recordings of John Doe's interviews herself, or if Defendant's investigators had accurately conveyed the content of John Doe's interviews, Defendant's Dean of Students would have understood that John Doe actually reported that he and A.T. were largely silent before they engaged in intercourse, and chatted and complimented each other while engaging in post-coital sexual activity.

212.   Defendant's Dean of Students found that John Doe's apparently contradictory statements "detract[ed] from his overall credibility" and "render[ed] him not credible for important facts."

213.   Defendant's Dean of Students did not reconcile her impressions of John Doe's inferior credibility with A.T.'s claims that she never consented to sexual activity with John Doe, alongside her text message to Danielle Larson that she was planning to "comply" after John Doe "put the moves" on her, and her subsequent message to Ms. Larson, "Lol I'm in his bed."

214.   Defendant's Dean of Students did not reconcile her impressions of John Doe's inferior credibility with A.T.'s statements that she and John Doe had not spoken to one another before he invited her to his party and she did not know him, and also that they spoke in class and were Facebook friends who periodically communicated by instant message.

215.   Defendant's Dean of Students did not reconcile her impressions of John Doe's inferior credibility with A.T.'s statements that she could not remember walking to John Doe's bedroom, and also that she required John Doe's assistance to travel to his bedroom.

216.   Defendant's Dean of Students did not reconcile her impressions of John Doe's inferior credibility with A.T.'s statement that she texted Ms. Larson while she was at John Doe's house to tell her that she was uncomfortable engaging in sexual activity with John Doe, and the fact that text messages provided by Ms. Larson do not support that claim.

217.   Defendant's Dean of Students did not reconcile her impressions of John Doe's inferior credibility with A.T.'s statement that she received an invitation from John Doe to come his party and she contemplated not going, but ultimately was "excited" to go because she wanted to meet new people, and her subsequent statement that she received multiple messages from John Doe to come to his party that were "coercive," and that she told him multiple times that she was tired and in bed and attempted to come up with a "variety of excuses" to avoid going to his home, but ultimately relented.

218.   Defendant's Dean of Students did not reconcile her impressions of John Doe's inferior credibility with A.T.'s statements that she clearly expressed her lack of consent to sexual activity verbally, and her comment, "It is my understanding that [John Doe] believes adequate consent is listening to a 'yes' or 'no.'  Consent runs deeper than a simple yes or no.  I consider his understanding of consent to be inadequate, childish, and extremely surface level."

219.   John Doe timely appealed Defendant's decision that he committed sexual misconduct.

220.   Defendant limited John Doe's bases for appeal to the following:

    a.   A procedural error that substantially affected the outcome of the process;

    b.   Significant newly-discovered evidence that was not previously available to submit during the complaint resolution process that may affect the outcome of the process;

    c.   The decision was arbitrary and capricious or violated academic freedom; or

   d.  The sanction or other response by the College is substantially

       disproportionate to the findings.

221.   After John Doe presented his appeal request to Defendant, John Doe was allowed

       to review part of Defendant's investigative file with the attorney he retained to help

       him with his appeal, but neither John Doe nor his attorney were allowed copies of

       documents in the file, and John Doe's attorney was given no opportunity to challenge

       any of material contained in the file.

222.   Because neither John Doe nor his attorney were allowed to have copy of any

       material in the file, John Doe and his attorney were required to spend approximately

       six hours travelling to and from Duluth in order to take notes from the file.

223.   To the degree that John Doe's attorney was allowed to ask any questions, she was

       required to follow the practice of asking John Doe her question, which he would then

       repeat to David Bauman with varying degrees of accuracy in order to receive an

       answer, adding to the time and expense associated with reviewing the part of the

       investigative file made available to John Doe.

224.   A.T. was allowed to comment on John Doe's appeal request.

225.   In response to John Doe's appeal request, A.T. states that she would "highly

       encourage [John Doe] to evaluate whether it is worth pursuing legal action," that "as

       it stands, [John Doe] has no criminal record, is not labeled as a sexual offender, has

       received all earned college credit, and maintains his privacy," and that John Doe

       could "very easily put this behind him and transfer to another school with junior

       standing and anonymity," even though A.T. contends that John Doe is a rapist.

226.   Biological samples taken from A.T. on October 10, 2016, are apparently being stored with the local law enforcement agency, a frequent practice in Minnesota whether law enforcement officials pursue a criminal charge or not.

227.   After recommending that John Doe stop defending himself and leave Defendant's campus, A.T. reminded John Doe that biological samples were being stored with local law enforcement, and threatened him with the potential for criminal charges if he continued to fight her claims and criticize the quality of Defendant's investigation.

228.   John Doe faces no criminal charges and has never even been interviewed by law enforcement.

229.   Defendant's Sexual & Gender-Based Misconduct Policy forbids retaliation against a person who cooperates with an investigation of sexual misconduct claims.

230.   John Doe complained on several occasions to David Bauman that A.T.'s threats that she has the power to initiate a criminal investigation or the pursuit of criminal charges against him, at the same time that she tells him that he should drop his legal defenses and move to a different school, are a form of intimidation and retaliation.

231.   Defendant repeatedly ignored John Doe's complaints of retaliation, though Defendant took pains to warn John Doe against retaliation, and ultimately rejected his complaint without investigation.

232.   On July 7, 2017, Defendant responded to John Doe's appeal of Defendant's decision that he committed sexual misconduct with an "Appeal Decision."

233.  In its appeal decision, Defendant referenced additional information that Defendant's appeal officers solicited and received from David Bauman on June 27, 2017; however, John Doe has not been given access to that information.

234.  In its appeal decision, Defendant indicates that "the appeal officers did not find persuasive [John Doe's] allegations that the adjudicator did not address certain allegedly 'exculpatory evidence' in the decision, which [John Doe] asserts goes to [A.T.'s] credibility and/or the plausibility of her account" because his arguments simply "state general disagreement with the findings of the adjudicator," even though the failure to address exculpatory evidence in a decision is the very definition of arbitrariness and capriciousness.

235.  Defendant's appeal decision also indicates that Defendant did not find his arguments regarding Defendant's due process violations compelling because "such allegations did not set forth procedural errors under the College's Policy, and, therefore, could not constitute procedural errors that substantially affected the outcome of the process," as if due process violations were irrelevant as long as they were baked into Defendant's policies.

236.  Nonetheless, Defendant agreed to allow John Doe's appeal to go forward "in light of certain concerns raised by [John Doe] about the information he allegedly received during the process about obtaining an attorney."

237.  Under Defendant's policies, appeal officers lack the authority to overturn the decision of an adjudicator; instead, the appeal officers can only remand the matter to an adjudicator.

238.   Defendant's notice to John Doe stated that the case against him "will be remanded for additional process and adjudication by a new adjudicator."

239.   The new adjudicator that Defendant has chosen is Defendant's Director of Residential Life, whose job it is to handle matters involving on-campus housing.

240.   John Doe objected to the Defendant's choice of adjudicator on remand and expressed concerns that the adjudicator might be biased against witness T.S. given previous conflicts between the two, as well as concerns that the adjudicator was not qualified to serve in that position.

241.   Defendant ignored, and then dismissed John Doe's concerns without explanation.

242.   On remand, John Doe was allowed to listen to recordings of his own interviews, but was not allowed to have a copy of those recordings.

243.   Instead, he again was required to pay his attorney to travel from the Minneapolis/St. Paul area and back in order to listen to the recordings, where she was allowed to take notes from them.

244.   On remand, Defendant did not allow John Doe to listen to the recordings of the interviews of other witnesses.

245.   When questioned why Defendant would allow John Doe to listen only to the recordings of his own interviews, David Bauman refused to say any more than that it was Defendant's "policy," but the policy was no more than an arbitrary and *ad hoc* decision made by Defendant.

246.   During the course of the remanded proceeding, John Doe repeatedly asked David Bauman for information relevant to the proceeding, including such questions as:

    a.  How did Mr. Bauman determine that the new adjudicator was impartial?

    b.  How many Title IX cases has the new adjudicator presided over?

    c.  What was the process used to reject John Doe's retaliation complaint, and will Defendant reconsider that decision?

    d.  Whose responsibility is it to select the adjudicator?

247.   Mr. Bauman referred to John Doe's questions as "impertinent," and has refused to answer almost all of the questions John Doe has posed to him.

248.   John Doe also raised concerns regularly with Mr. Bauman regarding whether Defendant's procedures afforded him adequate due process and complied with Title IX and other laws, but Defendant ignored those concerns.

249.   Defendant allowed John Doe to respond to the same investigative file on remand, but again limited his response to 2000 words or less.

250.   Due to the gravity of the accusations, Defendant's failure to provide John Doe with a hearing in which he could defend himself, Defendant's numerous errors in investigating and adjudicating the matter, and the number of inconsistencies and falsehoods in A.T.'s reporting, John Doe's response totaled nearly 11,000 words.

251.   Defendant refused to accept John Doe's full response, and so he was limited to submitting an outline of the defenses in his full statement, which contained fewer than 2000 words.

252.   At the same time that John Doe submitted his full response, he also submitted sworn affidavits from M.B. and T.S. in which they declared under penalty of perjury

that virtually every claim A.T. made about events occurring while they were present was false.

253. After receiving M.B. and T.S.'s affidavits, Defendant contacted M.B. and T.S. to interview them again, citing "inconsistencies" in M.B.'s testimony.

254. Defendant would not tell M.B. or John Doe the way in which it regarded M.B.'s affidavit as differing from her previous statements to Defendant.

255. On July 28, 2017, David Bauman sent John Doe an email message that Defendant would not accept the sworn affidavits, claiming that its policies prohibited it from doing so; however, Defendant refused to identify the policy that limited its ability to accept the affidavits.

256. In their interviews, Defendant's investigators do not ask witnesses to swear an oath to tell the truth under penalty of perjury.

257. Defendant accepted written statements from A.T., John Doe, and B.C. and incorporated those statements into its investigation report and decision.

258. Mr. Bauman's July 28, 2017, message to John Doe also stated that Defendant understood that John Doe's attorney discouraged M.B. from speaking to Defendant.

259. On July 29, 2017, John Doe informed Mr. Bauman by email that his attorney did not discourage M.B. and T.S. from talking to Defendant, but rather she asked them to tell her if Defendant contacted them so that she could help them find an attorney to accompany them to any re-interview.

260. John Doe also asked Defendant not to arbitrarily close its investigation until the attorney representing M.B. and T.S. could review any necessary documentation, listen

to Defendant's recordings of M.B. and T.S.'s previous statements, and discuss with

them any allegations of inconsistent reporting so that M.B. and T.S. could decide how

best to respond to Defendant's request to interview them again.

261.   Mr. Bauman ignored John Doe's message, and closed Defendant's investigation

arbitrarily on July 31, 2017.

262.   On August 4, 2017, John Doe again was required to drive six hours to Duluth and

back in order to read A.T.'s comments on his response to the investigative file on

remand.

263.   A.T.'s comments amounted to a two-sentence statement that she would say no

more about her accusations or the concerns John Doe has raised.

264.   A.T. subsequently changed her mind about responding to John Doe's challenges to

her accusations, and John Doe once more drove six hours to Duluth and back to

review A.T.'s statement.

265.   In her most recent statement, A.T. now claims that if she was not drugged, and

could not have been intoxicated, she might have been unusually impaired by the small

amount of alcohol that she consumed because she is diabetic.

266.   There has been no investigation of A.T.'s new claims that she may have become

incapacitated after eating what she described previously as a large meal and

consuming 1.25 ounces of distilled liquor because she is diabetic.

267.   In her most recent statement, A.T. claims now also that John Doe sent messages to

her on October 9, 2016, asking if she knew that she engaged in sexual intercourse

with him, but A.T. provided no copies of such messages to support this new claim.

268.  John Doe was not given an opportunity to respond to A.T.'s new claims, which are false.

269.  On August 9, 2017, M.B. and T.S.'s attorney, Zorislav Leyderman, contacted Mr. Bauman by email to inform Mr. Bauman that he represented M.B. and T.S., to ask Mr. Bauman to describe any inconsistencies that he believed existed in M.B. or T.S.'s interview statements, and to obtain copies of the recordings of their initial interviews so that he could discuss the possibility with them of appearing for another set of interviews.

270.  Mr. Bauman ignored Mr. Leyderman's message.

271.  On August 28, 2017, Defendant's adjudicator on remand sent an email message to David Bauman that he had seen references to M.B. and T.S.'s affidavits in John Doe's statements, and asked for more information about the circumstances surrounding the statements, including when Defendant received them and what actions, if any, Defendant took upon receiving them.

272.  David Bauman responded to the adjudicator that he received "forms" that were "represented to be sworn affidavits," but had no information about how they were prepared and whose content the statements contained, even though they each bore the affiants' signatures; however, Mr. Bauman neglected to tell the adjudicator that he failed to ask John Doe for any additional information that he felt he needed.

273.  Mr. Bauman told the adjudicator that it was not Defendant's practice to accept written statements, but he neglected to tell the adjudicator that Defendant had already accepted multiple written statements from A.T., John Doe, and B.C.

274.   Mr. Bauman told the adjudicator that John Doe's attorney advised M.B., in particular, not to speak with him, even though he knew this was not true based on John Doe's correspondence of July 29, 2017.

275.   Mr. Bauman told the adjudicator that he informed M.B. that she would have until July 31, 2017, to decide whether she would allow Defendant to interview her a second time, and that the date "came and went without any further response," but neglected to tell the adjudicator that he ignored a message from M.B.'s attorney about M.B.'s potential willingness to be interviewed again.

276.   Mr. Bauman did not provide the adjudicator with copies of M.B. and T.S.'s affidavits.

277.   On August 29, 2017, John Doe corrected the misleading statements in Mr. Bauman's message to the adjudicator, and attached M.B. and T.S.'s affidavits to the message.

278.   On August 29, 2017, Mr. Bauman sent copies of M.B. and T.S.'s affidavits to A.T. by email for her review, even though Mr. Bauman has uniformly refused to provide copies of any document in Defendant's possession for John Doe, requiring John Doe and his attorney to repeatedly travel hours to see any part of Defendant's file.

279.   The adjudicator on remand has not made a ruling, but John Doe's ability to participate in a student teaching assignment during the 2017-2018 school year is quickly disappearing, delaying his graduation date.

## CAUSES OF ACTION

### COUNT I

**Title IX Violation—Due Process**

280.  John Doe reincorporates all previous paragraphs as if fully set forth herein.

281.  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title

IX") provides in relevant part that:

> No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or shall be subjected to
> discrimination under any education program or activity receiving Federal
> financial assistance.

282.  Upon information and belief, Defendant receives federal funding through various

means including, without limitation, student loans provided to its students directly

by the federal government and through other funds furnished by the federal

government.

283.  Regulations implementing Title IX require that schools "adopt and publish

grievance procedures providing for the prompt and equitable resolution of

student… complaints alleging any action which would be prohibited by" Title IX

or its regulations.

284.  To assist schools with implementing those regulations, the Office of Civil Rights

("OCR") of the United States Department of Education has identified a number of

factors to be used in determining whether a school's procedures satisfy the

"prompt and equitable" requirements of the regulations.

285.  According to OCR's guidance, procedures adopted by a school covered by Title

IX must not only ensure the Title IX rights of the complainant, but must also

"accord[] due process to both parties involved…."  Pursuant to the OCR's Revised

Sexual Harassment Guidance, "due process" must include, among other things, "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence."

286. The degree of due process required is governed by the student's interest that is affected by Defendant's action; the risk of an erroneous deprivation of such interest through the procedures used; and the probable value, if any, of additional or substitute procedural safeguards.

287. John Doe has a compelling interest in preserving his educational status, his good reputation, his future educational and employment opportunities, his professional licensing prospects, and his earning capacity in the face of serious sexual misconduct charges.

288. Defendant has a compelling interest in impartially adjudicating quasi-criminal sexual misconduct allegations.

289. Defendant's actions as described in the paragraphs above increased the risk of erroneous deprivation of John Doe's educational status, his good reputation, his future educational and employment opportunities, his professional licensing prospects, and his earning capacity in the face of serious sexual misconduct charges.

290. If Defendant would have taken the following actions, John Doe's ability to effectively and efficiently respond to A.T.'s claims would have been improved and the integrity of Defendant's fact-finding and adjudication would have been

enhanced, while the overall fiscal and administrative burden on Defendant would

have been reduced by:

    a.  Providing prompt notice to John Doe that he was the subject of a sexual

        misconduct accusation, instead of waiting four months as Defendant did;

    b.  Providing John Doe with meaningful notice of A.T.'s accusations;

    c.  Providing John Doe with accurate information about his ability to use the

        services of an attorney;

    d.  Providing John Doe with access to recordings of witness interviews;

    e.  Providing copies of all the text message that A.T. sent related to her

        accusations, rather than only some of them;

    f.  Producing an investigative report that was complete and accurate;

    g.  Providing John Doe with copies of any of the documents kept in the

        investigative file;

    h.  Allowing John Doe to defend himself in an in-person hearing consistent

        with Defendant's own policies;

    i.  Allowing John Doe to cross-examine his accuser in at least some fashion;

    j.  Allowing John Doe to examine the witnesses A.T. identified;

    k.  Allowing John Doe's identified witnesses to provide in-person testimony to

        the adjudicator;

    l.  Allowing John Doe to talk to witnesses about the accusations he faced and

        the events of October 8, 2016, and October 9, 2016;

m. Allowing John Doe to defend himself using more than 2000 written words; particularly in light of the fact that John Doe was not allowed to defend himself in a hearing;

n. Providing investigators and adjudicators whose primary interest is in impartially investigating and adjudicating sexual misconduct claims;

o. Providing adjudicators with the education, training, and experience to adequately evaluate claims involving the parties' rights under federal and state law;

p.  Adjudicating quasi-criminal allegations of sexual misconduct by using a higher standard of proof than the preponderance of the evidence;

q. Accepting sworn affidavits from witnesses that included information critical to John Doe's defense;

r. Swearing in witnesses before taking their statements;

s. Keeping Defendant's investigation on remand open long enough for witnesses to testify with the assistance of their counsel; and

t. Refusing to accept A.T.'s statement containing new claims ten months after her first report of sexual misconduct.

291. Defendant's violation of John Doe's right to due process under Title IX were a result of Defendant's deliberate indifference to John Doe's known rights and caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and

future economic loss; loss of educational opportunities; and loss of future career prospects.

## COUNT II

### Title IX Violation—Erroneous Outcome

292.    John Doe reincorporates all previous paragraphs as if fully set forth herein.

293.    A plaintiff prevails on an erroneous outcome theory under Title IX where there are facts sufficient to cause doubt as to the accuracy of the disciplinary proceeding, there are facts that support a plausible inference of gender bias, and there is a causal connection between the alleged gender bias and the erroneous outcome.

294.    A.T.'s claims of sexual assault rest in large part on the idea that she become extremely intoxicated after consuming only 1.25 ounces of distilled spirits after eating what she initially described as a large dinner.

295.    The near impossibility of that claim is sufficient to cast doubt as to the accuracy of the outcome of Defendant's disciplinary proceeding.

296.    Defendant's willingness to accept such an impossible claim without any critical analysis supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

297.    Had Defendant subjected A.T.'s claim that she began to become heavily intoxicated upon consuming 1.25 ounces of distilled spirits to any real inspection, A.T.'s claims would have fallen apart and it is extremely unlikely that an unbiased and capable decision-maker would have concluded that it was more likely than not that John Doe was guilty of sexual misconduct.

298.  A.T.'s claims rest also on the alternative idea that John Doe drugged her in order to sexually assault her.

299.  The near impossibility of that claim is sufficient to cast doubt as to the accuracy of the outcome of Defendant's disciplinary proceeding.

300.  Defendant's willingness to accept such an impossible claim without any critical analysis supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

301.  Had Defendant subjected A.T.'s claim that John Doe drugged her to any real inspection, A.T.'s claims would have fallen apart and it is extremely unlikely that an unbiased and capable decision-maker would have concluded that it was more likely than not that John Doe was guilty of sexual misconduct.

302.  The fact that independent witnesses have sworn an oath that A.T. was not telling the truth when she said she was slurring her words, put her head on the table, and had to be physically helped to move from the couch to John Doe's bedroom is sufficient to cast doubt on the accuracy of the outcome of Defendant's disciplinary proceeding.

303.  Defendant's willingness to rely on witness testimony that supported A.T.'s claims of inebriation from a student who reported that he consumed twenty-five alcoholic beverages, instead of the testimony of witnesses M.B., T.S., and John Doe, who reported that they consumed a much more modest amount of alcohol and whose testimony significantly undermined A.T.'s credibility, without explanation,

supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

304. Defendant's failure during its investigation to ask M.B. and T.S. the obvious question of whether they were present when John Doe and A.T. walked to his room, and whether A.T. went to John Doe's room willingly and without the need for physical support, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

305. Defendant's decision to refuse the sworn affidavits of M.B. and T.S. describing A.T.'s lack of inebriation and willingness to join John Doe in his bedroom, and Defendant's refusal to identify the policy that allowed it to do so, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender and Defendant's deliberate indifference to John Doe's known rights.

306. Defendant's decision to intimidate witness M.B. by claiming that her sworn affidavit contained statements inconsistent with information she previously gave to Defendant's interviewers and refusing to explain the nature of those alleged inconsistencies is retaliatory and supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender and Defendant's deliberate indifference to John Doe's known rights.

307. Defendant's decision to close its investigation on remand while ignoring the request of M.B. and T.S.'s attorney for information needed so that he can advise his clients before they decide whether they will consent to be interviewed by

48

Defendant a second time supports a plausible inference of gender bias as part of a
pattern of decision-making that tends to show the influence of gender Defendant's
deliberate indifference to John Doe's known rights.

308. M.B. and T.S. are independent witnesses with testimony about facts that
significantly undermine A.T.'s credibility, and it is very unlikely that with access
to that testimony an unbiased and capable factfinder would find that it is more
likely than not that John Doe was guilty of sexual misconduct.

309. Defendant's decision to treat John Doe as not credible based on a single
inconsistency—explainable contradictory statements about A.T.'s degree of
inebriation—while completely ignoring significant and repeated inconsistencies in
A.T.'s statements, supports a plausible inference of gender bias as part of a pattern
of decision-making that tends to show the influence of gender.

310. It is very unlikely that an unbiased and capable decision-maker would have found
A.T. more credible than John Doe if the decision-maker had not completely
ignored the degree to which A.T.'s statements were inconsistent.

311. The fact that Defendant did not notify John Doe of A.T.'s anonymous report that
he committed sexual misconduct, even though he would have been best able to
rebut an accusation that he committed sexual assault at the time of the anonymous
report, supports a plausible inference of gender bias as part of a pattern of
decision-making that tends to show the influence of gender.

312. Had Defendant informed John Doe on or around October 10, 2016, that he had
been accused of sexual misconduct, John Doe would have been able to

immediately respond to such claims at a time when all parties' and witnesses' recollections were at their freshest, and an unbiased and capable decision-maker would have been much less likely to conclude that it was more likely than not that John Doe was guilty of sexual misconduct.

313.  The fact that Defendant urged John Doe to trust and use one of Defendant's employees for support, and then interviewed that support person as a part of its investigation into whether John Doe committed sexual misconduct, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

314.  Defendant's decision to remove John Doe from a class he shared with A.T. immediately after interviewing him for the first time and before adjudication of A.T.'s claims supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

315.  Defendant's failure to include text messages from A.T. in its report stating that John Doe was "putting the moves" on her and she planned to "comply," and "lol I'm in his bed," and other messages that undermined A.T.'s credibility, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender and Defendant's deliberate indifference to John Doe's known rights.

316.  It is unlikely that an unbiased and capable decision-maker would have found that it was more likely than not that John Doe was guilty of sexual misconduct if the

decision-maker had been given access to and considered A.T.'s text messages about her willingness to engage in sexual activity with John Doe.

317.   Defendant's decision to include A.T.'s statement that she sent text messages that she was uncomfortable engaging in sexual activity with John Doe in Defendant's investigative report, without also showing that text messages in Defendant's possession showed no such thing, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

318.   If Defendant had provided information in its investigative report showing that A.T.'s claim that she sent text messages that she was uncomfortable engaging in sexual activity with John Doe was untrue, it is much less likely that an impartial and competent decision-maker would have decided that it was more likely than not that John Doe was guilty of sexual misconduct and Defendant's deliberate indifference to John Doe's known rights.

319.   Defendant's failure to reach the obvious conclusion that statements from A.T. like, "It is my understanding that [John Doe] believes adequate consent is listening to a 'yes' or 'no,'" "Consent runs deeper than a simple yes or no," and "I consider his understanding of consent to be inadequate, childish, and extremely surface level," only make sense if A.T. gave verbal consent to sexual activity supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

320.   If Defendant had reached the obvious conclusion that A.T.'s statements only make sense if she gave verbal consent to sexual activity with John Doe, it is extremely

unlikely that an impartial and capable decision-maker would have reached the conclusion that it was more likely than not that John Doe had committed sexual misconduct.

321. Defendant's decision not to offer John Doe its "formal hearing option" (which Defendant's policy indicates is available to adjudicate claims of sexual misconduct, includes the right to present witnesses and to confront witnesses against the accused, and requires a student to meet a lower standard in order to successfully appeal an adverse decision) supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

322. If Defendant had made its formal hearing option available to John Doe, it is much less likely that an impartial and capable decision-maker would have concluded that it was more likely than not that John Doe had committed sexual misconduct because John Doe and his witnesses would have been able to interact directly with the decision-maker and clarify any concerns the decision-maker had.

323. Defendant's decision to define a person who makes a complaint of sexual misconduct before adjudication as the "victim" or the "victim/survivor" supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

324. Defendant's failure to obtain clear and specific information from A.T. regarding her claim that John Doe sexually assaulted her because Defendant did not want to "pressure" A.T., while interviewing John Doe on three different occasions,

oftentimes simply to repeat questions asked in previous interviews, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

325. Defendant has pursued on A.T.'s behalf claims that have significantly damaged John Doe's educational status, his good reputation, his future educational and employment opportunities, his professional licensing prospects, his earning capacity, and his emotional wellbeing in the face of serious sexual misconduct charges while shielding A.T.'s so-called "recovered memories" from any real inspection, and if Defendant had required A.T. to provide more than the barest of outlines of her claims, it is much less likely that an impartial and capable decision-maker would have concluded that it was more likely than not that John Doe had committed sexual misconduct.

326. Defendant's decision to create an adjudicatory process that allows only for the remand of a sexual misconduct complaint on appeal, rather than possible dismissal, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

327. Defendant's decision to reject John Doe's complaint that A.T.'s threat to put pressure on local law enforcement to open a criminal investigation if he continued in his efforts to enforce his rights under the law was an act of intimidation, an attempt to interfere with his rights, and a form of retaliation supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender.

328.  Defendant's decision to reject without explanation John Doe's concern that
      Defendant's adjudicator on remand was unqualified and could be biased against
      witness T.S. given their history of conflict supports a plausible inference of gender
      bias as part of a pattern of decision-making that tends to show the influence of
      gender.

329.  Defendant's pattern of making arbitrary, *ad hoc* decisions that disadvantage John
      Doe, and calling them "policy," supports a plausible inference of gender bias as
      part of a pattern of decision-making that tends to show the influence of gender.

330.  Defendant's decision to reject John Doe's written statement on remand because
      John Doe's statement contained more than 2000 words so that he could fully cover
      all of the relevant facts and errors on remand, particularly in light Defendant's
      willingness to otherwise modify its policies as Defendant saw fit, supports a
      plausible inference of gender bias as part of a pattern of decision-making that
      tends to show the influence of gender.

331.  Defendant's decision to do no more than accept new statements from John Doe
      and A.T. on remand, even though the matter was remanded because John Doe
      lacked access to an attorney for all of the initial investigative and adjudicatory
      processes, supports a plausible inference of gender bias as part of a pattern of
      decision-making that tends to show the influence of gender.

332.  Defendant's decision, without explanation, not to change significant defects in its
      investigative report that led to errors in Defendant's first decision, and that were
      brought to Defendant's attention on remand, supports a plausible inference of

gender bias as part of a pattern of decision-making that tends to show the influence of gender.

333. If Defendant had bothered to change its investigation report to reflect errors John Doe identified in the report on remand, an impartial and capable decision-maker would be less likely to conclude that it was more likely than not that John Doe had committed sexual misconduct.

334. Defendant's decision to ignore John Doe's repeated and legitimate requests for information while labeling those requests "impertinent" supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender and Defendant's deliberate indifference to John Doe's known rights.

335. Defendant's apparent disinterest in John Doe's concerns that Defendant's procedures did not afford him adequate due process and did not comply with Title IX and other laws, supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender, and demonstrates Defendant's deliberate indifference to John Doe's known rights.

336. The decision of Defendant's Title IX Coordinator to provide misleading information to Defendant's adjudicator concerning the affidavits of M.B. and T.S. supports a plausible inference of gender bias as part of a pattern of decision-making that tends to show the influence of gender, and demonstrates Defendant's deliberate indifference to John Doe's known rights.

337. Defendant's violation of John Doe's right to be free from an erroneous outcome caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; loss of educational opportunities; and loss of future career prospects.

## COUNT III

### Title IX Violation—Retaliation and Selective Enforcement

338. John Doe reincorporates all previous paragraphs as if fully set forth herein.

339. To succeed under a Title IX retaliation claim, a plaintiff must show that he engaged in a protected activity, he suffered an adverse action that might have dissuaded a reasonable person from engaging in that protected activity, and there was a relationship between the protected activity and the adverse action.

340. As a part of Defendant's investigation and adjudication of A.T.'s claims, Defendant regularly reminded John Doe that he was not allowed to retaliate against A.T.

341. In May 2017, John Doe began to complain that Defendant's procedures were insufficient under Title IX and various state laws, and that if Defendant did not correct this problem, John Doe would file suit against Defendant in order to compel compliance and enforce his rights.

342. When A.T. learned that John Doe was complaining that Defendant's procedures were insufficient under Title IX and other laws, she suggested that he "evaluate whether it is worth pursuing legal action" against Defendant, urged John Doe to

abandon his efforts to prevail on appeal using Defendant's process, and implied

that if John Doe did not do so, she would make efforts to encourage the criminal

prosecution of John Doe.

343.   A.T.'s threat to encourage the criminal prosecution of John Doe if he did not

abandon his claims against Defendant and his attempts to prevail in Defendant's

appeal process might have dissuaded a reasonable person from seeking to enforce

his rights under the law.

344.   The connection between the protected activity and the threat of adverse action is

obvious as A.T. specifically threatened John Doe that if he does not stop engaging

in a protected activity, she will seek to injure him even more egregiously than she

already has.

345.   When Defendant ignored and then rejected John Doe's complaints of A.T.'s

retaliatory threat, which Defendant has the ability to control by enforcing its anti-

retaliation policy and imposing the prescribed punishment on A.T. so that John

Doe may continue to defend his rights under Title IX and state law without

interference, Defendant violated John Doe's right to be free from retaliation under

Title IX.

346.   Defendant's unwillingness to accept John Doe's complaint that A.T. was

retaliating against him for engaging in a protected activity under Title IX, while

providing regular notice to John Doe that he would be punished if he retaliated

against A.T. for engaging in a protected activity under Title IX, amounts to illegal

selective enforcement based on gender.

347.   Defendant's violation of John Doe's right to be free from retaliation and selective

enforcement caused John Doe to sustain substantial injury, damage, and loss,

including, but not limited to mental anguish and severe emotional distress.

## COUNT IV

**Violation of Common Law Duty of Fair Treatment**

348.   John Doe reincorporates all previous paragraphs as if fully set forth herein.

349.   In Minnesota, the requirements imposed by the common law on private

universities parallel those imposed by the due process clause of the United States

Constitution on public universities.

350.   The degree of due process public universities are required to provide by the United

States Constitution is governed by the student's interest that is affected by

Defendant's action; the risk of an erroneous deprivation of such interest through

the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards.

351.   John Doe has a compelling interest in preserving his educational status, his good

reputation, his future educational and employment opportunities, his professional

licensing prospects, and his earning capacity in the face of serious sexual

misconduct charges.

352.   Defendant has a compelling interest in impartially adjudicating quasi-criminal

sexual misconduct allegations, though Defendant has no significant expertise in

this area.

353.    The same facts that support John Doe's claims under Count I also support his

claims under Count IV.

## COUNT V

### Negligence

354.    John Doe reincorporates all previous paragraphs as if fully set forth herein.

355.    A general duty of reasonable care is imposed when a defendant's own conduct

creates a foreseeable risk of injury to a foreseeable plaintiff.

356.    In a claim for negligence, a plaintiff must prove that the defendant has a legal duty

to the plaintiff to take some action, there was a breach of that duty, the breach of

the duty was the proximate cause of the harm to the plaintiff, and the plaintiff was

damaged.

357.    Defendant owes a duty of care to John Doe not to arbitrarily dismiss him as a

student, to exercise reasonable care and judgment in investigating and adjudicating

misconduct claims against him, to craft a misconduct policy that conforms with

the law, and to otherwise conduct itself lawfully and in ways that do not create a

risk of foreseeable injury.

358.    The risk of harm to Defendant's students when Defendant fails to exercise

reasonable care and judgment in investigating and adjudicating misconduct claims

is foreseeable.

359.    Defendant breached its duty of care to John Doe by failing to exercise reasonable

care and judgment, thereby foreseeably increasing the risk of erroneous

deprivation of his educational status, his good reputation, his future educational

and employment opportunities, his professional licensing prospects, and his earning capacity in the face of serious sexual misconduct charges when Defendant:

   a. Failed to notify John Doe that he was the subject of anonymous report of sexual misconduct in a timely matter;

   b. Failed to provide John Doe with notice of A.T.'s claims that contained enough information for him to understand his defenses to those claims;

   c. Told John Doe's parents that John Doe could not use the services of an attorney during Defendant's initial investigation and adjudication, even though Defendant's own policies allowed John Doe to use the services of an attorney;

   d. Failed to obtain all of the text messages that A.T. sent that were connected in any way to her claim that John Doe sexually assaulted her;

   e. Crafted an investigative report that failed to accurately convey information obtained during Defendant's investigation;

   f. Provided adjudicators who lacked the education, training, and experience to adequately evaluate claims involving the parties' rights under federal and state law and who lacked even basic information about due process;

   g. Refused to accept sworn affidavits from witnesses that included information critical to John Doe's defense;

   h. Used the testimony of witnesses that was unsworn in order to adjudicate A.T.'s claim that John Doe committed sexual misconduct;

i.  Accepted A.T.'s preposterous claim that she began to become heavily
    intoxicated upon consuming 1.25 ounces of distilled spirits without
    subjecting that claim to any scrutiny;

j.  Accepted A.T.'s preposterous claim that John Doe drugged her without
    subjecting that claim to any scrutiny;

k.  Relied on witness testimony that supported A.T.'s claims of inebriation
    from a student who reported that he consumed twenty-five alcoholic
    beverages, instead of the testimony of witnesses M.B., T.S. and John Doe,
    who reported that they consumed a much more modest amount of alcohol
    and whose testimony significantly undermined A.T.'s credibility;

l.  Failed during its investigation to ask M.B. and T.S. the obvious question of
    whether they were present when John Doe and A.T. walked to his room,
    and whether A.T. went to John Doe's room willingly and without the need
    for physical support;

m.  Failed to include text messages from A.T. in its report stating that John Doe
    was "putting the moves" and her and she planned to "comply," "lol I'm in
    his bed," and other messages that undermined A.T.'s credibility;

n.  Decided to include in its investigative report A.T.'s statement that she sent
    text messages that she was uncomfortable engaging in sexual activity with
    John Doe, without also showing that text messages in Defendant's
    possession showed no such thing;

o.  Failed to reach the obvious conclusion that statements from A.T. like, "It is my understanding that [John Doe] believes adequate consent is listening to a 'yes' or 'no,'" "Consent runs deeper than a simple yes or no," and "I consider his understanding of consent to be inadequate, childish, and extremely surface level," only make sense if A.T. gave verbal consent to sexual activity;

p.  Chose to define a person who makes a complaint of sexual misconduct before adjudication as the "victim" or the "victim/survivor;"

q.  Failed to obtain clear and specific information from A.T. regarding her claim that John Doe sexually assaulted her because Defendant did not want to "pressure" A.T.;

r.  Refused to keep its investigation on remand open long enough for witnesses to testify with the assistance of their counsel;

s.  Accepted a statement from A.T. containing the new claim, made ten months after she made her first complaint against John Doe and after her claims that she was drugged or inebriated were rebutted, that she might have become incapacitated after consuming 1.25 ounces of distilled spirits because she has Type I Diabetes without providing an opportunity for John Doe to rebut that claim; and

t.  Accepted a statement from A.T. containing the new claim, made ten months after she made her first complaint against John Doe, that John Doe sent her a message asking her if she knew that she engaged in sexual

intercourse with him, without requiring A.T. to provide a copy of the message she claims she received.

360.   Defendant's behavior as described above caused John Doe to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; loss of educational opportunities; and loss of future career prospects.

## COUNT VI

### Breach of Contract

361.   John Doe reincorporates all previous paragraphs as if fully set forth herein.

362.   Defendant's Student Handbooks, Sexual Misconduct Policy, and other published guidance and policies comprise a contract, and at all times relevant hereto, a contractual relationship existed between John Doe and Defendant.

363.   Defendant is required to act in accordance with its Sexual Misconduct Policy and honor those principles in their investigation of complaints, in the process of adjudicating complaints, and in resolving appeals brought to challenge disciplinary decisions.

364.   The promises set forth in the Student Handbook and the Sexual Misconduct Policy were supported by valid consideration.

365.   John Doe fully complied with all of his contractual obligations to Defendant, including payment of tuition and compliance with enrollment procedures.

366.   Based on the facts and circumstances, Defendant breached its contractual obligations to John Doe by, among other things:

a. Discriminating against John Doe on the basis of his gender;

b. Failing to provide adequate policies and procedures for investigation and adjudication of complaints of alleged sexual misconduct;

c. Violating Defendant's policy against gender/sex-based discrimination by establishing a *de facto* presumption, on the basis of gender stereotypes, that John Doe committed sexual assault;

d. Failing to provide John Doe with adequate notice of A.T.'s accusations before interviewing him;

e. Conducting a cursory, superficial, biased, and fundamentally unfair investigation, hearing, and appeal process;

f. Failing to allow John Doe to present an adequate defense by denying him the formal in-person hearing described as available under Defendant's policies;

g. Rendering an arbitrary and capricious determination decision against John Doe; and

h. Telling John Doe, through his parents, that he could not use an attorney to assist in his defense, in violation of Defendant's own policies, and then failing to correct the breach when it was brought to Defendant's attention by doing no more than allowing John Doe to provide two additional written statements to Defendant.

367. The contract between Defendant and John Doe imposed upon Defendant a duty of good faith and fair dealing, including a duty to conduct a diligent, unbiased and

meaningful investigation, adjudication, and appellate review according to
Defendant's Sexual Misconduct Policy and other policies.

368.   Defendant breached and violated the covenant of good faith and fair dealing
implied in its agreement with John Doe by failing to conduct a diligent, unbiased,
and meaningful investigation, adjudication, and appellate review.

369.   As a direct, proximate, and foreseeable consequence of those breaches, John Doe
sustained significant damages, including, without limitation, mental anguish;
severe emotional distress; injury to reputation; past and future economic loss; loss
of educational opportunities; and loss of future career prospects.

## **RELIEF REQUESTED**

WHEREFORE, John Doe, demands that judgment be entered in his favor and against
Defendant for the following relief:

1.   Order Defendant to correct John Doe's academic and disciplinary record to
remove any findings issued by Defendant with respect to the charges leveled
against him by Defendant and/or A.T.;

2.   Order Defendant to verify this correction by providing John Doe with a notarized
letter confirming that any findings with respect to these charges have been
expunged from John Doe's record;

3.   Order Defendant to immediately allow John Doe to complete his requirements for
a degree at the Defendant's educational institution without restriction;

4.   Order Defendant to reinstate John Doe's scholarships;

5. Issue a permanent injunction that directs Defendant to comply with Title IX, including its due process requirements;

6. Award John Doe compensatory damages in an amount to be determined at trial, but not less than $75,000 for mental anguish, severe emotional distress, serious mental injury, injury to reputation, past and future economic loss, deprivations of due process, loss of educational opportunities, loss of future career prospects, and other injuries proximately caused by the wrongful conduct of Defendant;

7. Award John Doe his attorney's fees, disbursements, and costs pursuant to the provisions of 42 U.S.C. § 1988(b) (relating to Title IX); or pursuant to any other statute or common law doctrine providing for the award of attorney's fees, disbursements, and/or costs;

8. Award prejudgment interest; and

9. Grant such other and further relief as the Court may deem just and proper.


DATED:  August 31, 2017          **SCHOOL LAW CENTER, LLC**

By: /s/ Andrea L. Jepsen
Andrea L. Jepsen (#386781)
Amy J. Goetz (#214711)
452 Selby Avenue, Ste. 2E
St. Paul, MN  55102
Telephone (651) 222-6288

**ATTORNEYS FOR JOHN DOE**
**JOHN DOE**